UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ROBERT CHRISTOPHER CARPEZZI,

     Plaintiff,

v.

                                 Case No. 2:21-cv-180-JLB-KCD

UNITED STATES DEPARTMENT OF
JUSTICE,

     Defendant.

_____/

## <u>ORDER</u>

Plaintiff Robert Carpezzi, proceeding *pro se*, brings this suit against the United States Department of Justice (the "DOJ") to compel compliance with the Freedom of Information/Privacy Act ("FOIA"). (Doc. 49). The DOJ filed a Motion for Summary Judgment (Doc. 63), which Mr. Carpezzi opposed (Doc. 65). The DOJ filed a reply (Doc. 67) and Mr. Carpezzi filed a sur-reply (Doc. 69), which this Court considered despite the fact that Mr. Carpezzi did not seek leave to file such sur-reply. After careful review of the summary judgment record, the Court **GRANTS** the DOJ's motion for summary judgment.

1

## BACKGROUND[1]

In his Second Amended Complaint, Mr. Carpezzi claims that he seeks access to the following: (1) "[a]ll records, including American Online ('AOL') investigation into the illegal hacking and impersonation of [Mr. Carpezzi's] rccarpezzi@aol.com email address and the FBI's investigation into the matter[;]" and (2) "complete transcription of January 2016 conversation at FBI Headquarters in Denver."  (Doc. 49 at ¶ 2).

On November 23, 2015, Mr. Carpezzi wrote a letter to James Comey, demanding $35,000,000 for the "impersonating of [his] email address and thwarting any attempts for redress" and $1,750,000 for "all the other constitutional rights [he] [has] tossed to the curb."  (Doc. 65-8 at 4).

On January 21, 2016, Mr. Carpezzi initiated an in-person complaint with the Federal Bureau of Investigation ("FBI").  (Doc. 65-2; Doc. 63-1 at ¶ 31).  An FBI Complaint form ("FD-71") dated January 25, 2016, indicated that, among other things, Mr. Carpezzi believes that his email was hacked by the government, that he believes he is being followed by law enforcement, and that he complained about an IRS audit.  (Doc. 65-2 at 2).

On September 26, 2016, Mr. Carpezzi submitted a FOIA request to the FBI

---

[1] This background is based on the Statement of Undisputed Facts in the DOJ's motion for summary judgment (Doc. 63 at 1–4) and the Statement of Undisputed Facts in Mr. Carpezzi's response (Doc. 65 at 2–3), with citations to the record where available.  Mr. Carpezzi stated that he agreed with the DOJ's statement of undisputed facts, but added additional facts, which the DOJ indicated were irrelevant but did not dispute.  (*See* Doc. 65 at 2; Doc. 67 at 3–4).

explaining that his email address was "hacked into by the government/police" and that such hackers "took over [his] account [and] sent messages out to their colleagues." (Doc. 63-1 at 41). He indicated that he was "looking for all records, including AoI's investigation into the illegal hacking and impersonating of [his] email address and the FBI's investigation into the matter." (*Id.*). On October 4, 2016, the FBI advised Mr. Carpezzi that his letter "did not contain sufficient information to conduct an accurate search of the Central Records System." (*Id.* at 44). That letter provided several blanks for Mr. Carpezzi to fill in and a space for Mr. Carpezzi to provide any additional information that he thought would assist the FBI with their search for records. (*Id.*). On October 24, 2016, Mr. Carpezzi returned the letter, providing the requested information and certain additional information. (*Id.* at 48). He also requested a transcription of the January 2016 conversation at FBI Headquarters. (*Id.* at 49).

On December 5, 2016, the FBI sent a letter to Mr. Carpezzi indicating, in relevant part, that Mr. Carpezzi's request was received at FBI Headquarters and that they were searching the indices to the Central Records System ("CRS") for information responsive to the request. (*Id.* at 52). In a letter dated January 9, 2017, the FBI notified Mr. Carpezzi that it had reviewed and was releasing two pages with certain information withheld pursuant to FOIA exemptions (b)(6), (b)(7)(C), and (b)(7)(E). (*Id.* at 55).

On January 16, 2017, Mr. Carpezzi filed an administrative appeal with U.S. Department of Justice, Office of Information Policy (OIP), stating that the FBI's

response "was so vague it shows they chose not to disclose the information specifically requested." (*Id.* at 59).

On January 31, 2017, OIP sent Mr. Carpezzi a letter, stating that they construed his appeal as "limited to the adequacy of the FBI's search for responsive records" and affirmed the FBI's action on his request. (*Id.* at 70). OIP also advised Mr. Carpezzi of his right to "file a lawsuit in federal district court." (*Id.* at 71).

On May 18, 2017, the FBI sent Mr. Carpezzi a letter indicating that his complaint, which was directed to the DOJ, Office of the Inspector General, was referred to the Internal Investigations Section (IIS), Inspection Division (INSD), FBI, and explained that the IIS/INSD is "the FBI entity responsible for investigating allegations of misconduct or criminal activity on the part of FBI employees." (Doc. 65-4 at 2). The letter further informed Mr. Carpezzi that the IIS/INSD reviewed the matter and determined that it does not warrant the opening of an administrative inquiry. (*Id.*)

On January 15, 2018, Mr. Carpezzi wrote a letter to the FBI Director, alleging the impersonation of his email address and his inability to hire an attorney. (Doc. 65-5 at 2). And on June 11, 2019, Mr. Carpezzi wrote a similar letter to the then-Attorney General. (Doc. 65-6 at 2). Mr. Carpezzi received a response letter on June 11, 2019, letting him know that his letter was received and would be reviewed. (*Id.* at 3).

On January 6, 2020, Mr. Carpezzi filed a complaint styled as *Carpezzi v. Untied States of America – U.S. Postal Service. See* No. 2:20-cv-00005-JLB-MRM,

Doc. 1 (M.D. Fla. Jan. 6, 2020).  He filed an amended complaint on June 22, 2020, a

second amended complaint on March 5, 2021, and a third amended complaint on

April 4, 2021 (2:20-cv-00005 at Docs. 16, 47, 57).  The final amended complaint in

that case, which alleged that the United States Postal Service was stealing or

refusing to deliver Mr. Carpezzi's mail for political reasons, was dismissed without

prejudice for lack of subject matter jurisdiction on October 26, 2021.  (*See* 2:20-cv-

00005 at Doc. 64).

On September 30, 2020, the FBI sent another letter to Mr. Carpezzi,

responding to his FOIA request and civil action.  (Doc. 49-1 at 2; Doc. 63-1 at 73).

The letter stated that the FBI's Record/Information Dissemination Section ("RIDS")

conducted an additional search for records and identified "190" files, which are

FOIA administrative files, that were potentially responsive to Mr. Carpezzi's

request.  (Doc. 49-1 at 2; Doc. 63-1 at 73).  The letter further stated that the FBI

"does not routinely process '190' files, unless processing is specifically requested"

and instructed Mr. Carpezzi to notify RIDS in writing within thirty days from the

date of the letter if he desired to have these files processed.  (Doc. 49-1 at 2; Doc. 63-

1 at 73).  The letter specified that if RIDS did not hear from Mr. Carpezzi, it would

not process the records.  (Doc. 49-1 at 2; Doc. 63-1 at 73).

Finally, on December 4, 2020, the FBI sent a letter to Mr. Carpezzi, stating

that because the FBI did not receive a response to their September 30, 2020 letter,

it was enclosing only the FBI's initial release to the FOIA request, with Vaughn

coding and Bates numbers, along with an Explanation of Exemptions.  (Doc. 63-1 at

75).

On March 6, 2021, Mr. Carpezzi filed the present lawsuit.  (Doc. 1).  Mr. Carpezzi filed an amended complaint on October 8, 2021.  (Doc. 23).  After this Court entered an order (Doc. 48) granting the DOJ's motion to dismiss (Doc. 24), Mr. Carpezzi filed a second amended complaint on April 4, 2022 (Doc. 49).  The DOJ filed its answer on April 18, 2022.  (Doc. 50).

Mr. Carpezzi claims that the DOJ is in violation of FOIA.  (Doc. 49 at ¶ 6).  Mr. Carpezzi further alleges that he is being irreparably harmed because someone (allegedly a "state sponsored actor") illegally impersonated his AOL email address, rccarpezzi@aol.com.  (*Id.* at ¶ 7).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A district court must grant a motion for summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1299 (11th Cir. 2018).  An issue is "genuine" if a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof.  *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).  And a fact is "material" if, "under the applicable substantive law, it might affect the

outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "[W]here the material facts are undisputed and do not support a reasonable inference in favor of the non-movant, summary judgment may be properly granted as a matter of law." *DA Realty Holdings, LLC v. Tennessee Land Consultants, LLC*, 631 F. App'x 817, 820 (11th Cir. 2015).

The Eleventh Circuit has found that "[g]enerally, FOIA cases should be handled on motions for summary judgment, once the documents in issue are properly identified." *Miccosukee Tribe of Indians of Fla. v. U.S.*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Miscavige v. I.R.S.*, 2 F.3d 366, 369 (11th Cir. 1993)). "[I]n FOIA litigation, an agency has the burden of proving that it properly invoked any FOIA exemptions when it decided to withhold information." *Id.* at 1258 (citing *Ely v. F.B.I.*, 781 F.2d 1487, 1489–90 (11th Cir. 1986)). "To prevail on a FOIA motion for summary judgment, 'the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements.'" *Hooker v. Dep't of Veterans Affs.*, No. 8:22-cv-956-CEH-MRM, 2023 WL 1929701, at *4 (M.D. Fla. Feb. 10, 2023) (quoting *Goland v. Cent. Intel. Agency*, 607 F.2d 339, 352 (D.C. Cir. 1978)).

## ANALYSIS

The FOIA requires government agencies to disclose documents requested by members of the public. *See* 5 U.S.C. § 552(a)(3)(A). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society,

needed to check against corruption and to hold the governors accountable to the governed." *Hawkins v. U.S. Dep't of Lab.*, No. 3:06-cv-00269-J-32TEM, 2005 WL 2063811, at *1 (M.D. Fla. 2005) (quoting *Nat'l Lab. Rels. Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). But "FOIA disclosure is not without limits. It specifies nine exemptions from its general disclosure provisions." *Id.* (citing 5 U.S.C. § 552(b)). "These exemptions are designed to safeguard various public interests against the harms that would arise from overbroad disclosure." *Id.* (citations and quotation marks omitted). In keeping with FOIA's policy favoring disclosure, however, FOIA's "disclosure provisions are read broadly, its exemptions narrowly." *Id.* (citing *Ely*, 781 F.2d at 1489). "In a FOIA case, a district court reviews an agency's decision de novo and, if it finds that an exemption does not apply, may order the agency to produce any improperly withheld document." *Id.* (citing 5 U.S.C. § 552(a)(4)(B)). The determination of whether an exemption applies is a matter of law. *Id.* (citing *Wickwire Gavin, P.C. v. United States Postal Serv.*, 356 F.3d 588, 591 (4th Cir. 2004)).

I.   <u>The FBI's search was reasonably calculated to uncover all responsive documents.</u>

The DOJ maintains that RIDS conducted searches reasonably calculated to uncover all records that might be responsive to Mr. Carpezzi's request through the CRS. (Doc. 63 at 7). "To establish the adequacy of a search for responsive documents, a government agency must show beyond a material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *Broward Bulldog, Inc. v. U.S. Dep't of Justice*, 939 F.3d 1164, 1176 (11th Cir. 2019)

(quotation marks and citations omitted).  The agency may meet its burden by "producing affidavits of responsible officials so long as the affidavits are relatively detailed, nonconclusory, and submitted in good faith."  *Id.* (quotation marks and citations omitted).  Once the agency satisfies that burden, "then the burden shifts to the requester to rebut the agency's evidence by showing that the search was not reasonable or was not conducted in good faith."  *Id.* (quotation marks and citations omitted).  "Because the standard is one of reasonableness, the Act does not require an agency to exhaust all files which conceivably could contain relevant information."  *Id.* (quotation marks and citations omitted).  Thus, "a requester cannot rebut a showing of an adequate search by arguing that he received only a subset of the documents that he thought existed."  *Id.*

The Department of Justice satisfied its burden by submitting the Declaration of Michael G. Seidel, who is the Chief of RIDS, is familiar with the procedures followed by the FBI in responding to FOIA requests, and was aware of the FBI's handling of Mr. Carpezzi's FOIA request.  (Doc. 63-1 at 2–3).  The Court finds that Mr. Seidel's declaration was "relatively detailed, nonconclusory, and submitted in good faith."  *See Broward Bulldog, Inc.*, 939 F.3d at 1176.

Mr. Seidel described the CRS as an "extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its mission and integrated functions . . . ."  (Doc. 63-1 at 7).  He further explained that the CRS is "indexed in a manner which meets the FBI's investigative needs and priorities, and

allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties." (*Id.* at 8). He also described Automated Case Support ("ACS"), which was an electronic, integrated case management system designed to enable the FBI to locate, retrieve, and maintain information in its files and the Universal Index ("UNI"). (*Id.* at 9). He explained that the UNI was the automated index of the CRS searchable via ACS that provided all offices of the FBI with a centralized, electronic means of indexing pertinent investigative information into FBI files for future retrieval via index searching. (*Id.*). Mr. Seidel explained that on August 1, 2018, the ACS case management system was decommissioned and ACS data was migrated into Sentinel (which became effective FBI-wide on July 1, 2012). (*Id.* at 10). Sentinel is the FBI's next generation case management system and retained the index search methodology and function whereby the CRS is queried via Sentinel for pertinent index main or reference entries in case files. (*Id.*).

Mr. Seidel described RIDS's general search efforts when Mr. Carpezzi's FOIA request was submitted, which included conducting an index search via ACS/UNI and, when records were reasonably expected to have been created on or after July 1, 2012, RIDS conducted an index search of Sentinel records to ensure that all relevant data indexed after the implementation of Sentinel was captured. (*Id.* at 10–11). He then explained that a FOIA analyst must consider potentially responsive indexed records against the specific parameters of individual requests, and responsiveness determinations are made once indexed records are gathered,

10

analyzed, and sorted by FOIA analysts who then make informed "coping decisions to determine the total pool of records responsive to an individual request." (*Id.* at 11).

Following that, Mr. Seidel explained the adequacy of the search for Mr. Carpezzi's request.  He explained:

> In response to Plaintiff's request, RIDS conducted a CRS index search for potentially responsive records employing the ACS/UNI and the Sentinel automated indices by entering the following search terms: Carpezzi, Robert, Christopher; Carpezzi, Robert, C; Carpezzi, Robert; Carpezzi, R, Christopher; Carpezzi, Chris; Carpezzi, R, C; Carpezzi, Christopher; Robert Christopher Carpezzi; Robert C Carpezzi; Robert Carpezzi; R Christopher Carpezzi; Chris Carpezzi; R C Carpezzi; and Christopher Carpezzi.

(Doc. 63-1 at 11–12).  Mr. Seidel also explained that because Mr. Carpezzi's request sought information about himself, such information would reasonably be expected to appear in the CRS via the index search methodology.  (Doc. 63-1 at 12).  Moreover, Mr. Seidel explained that because Mr. Carpezzi provided no information for RIDS to reasonably conclude that records would reside outside the CRS and there was no indication from the information located from the CRS index search efforts that responsive records would reside in any other FBI system or location, there was no basis for RIDS to conclude that a search elsewhere could reasonably be expected to locate responsive material subject to the FOIA.  (Doc. 63-1 at 12).

Moreover, Mr. Carpezzi fails to rebut the DOJ's evidence that the FBI conducted an adequate search.  Indeed, Mr. Carpezzi does not challenge the sufficiency of the CRS or the search terms that the FBI used.  Instead, Mr. Carpezzi

11

accuses the DOJ of "purposely chang[ing] records searched." (Doc. 65 at 6). Mr. Carpezzi does not provide any evidence that such activity occurred, and his bare, unsupported speculations do not create a genuine issue of material fact. *See Gadsby v. Am. Gold Corp. of Cal.*, 557 F. App'x 837, 839 (11th Cir. 2014) ("We draw all factual inference in a light most favorable to the nonmoving party. . . . But an inference based on speculation and conjecture is not reasonable.") (citation omitted).

Moreover, to the extent that Mr. Carpezzi requests that the FBI create a complete transcript of his January 2016 conversation at FBI Headquarters in Dener (*see* Doc. 65 at 5), the FBI is not obligated to create a transcript if one does not exist. *See Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980) ("[FOIA] does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained.").

II. <u>Although the DOJ met its burden of showing that the documents retrieved in response to Mr. Carpezzi's FOIA request could be exempted under 5 U.S.C. § 552a(j)(2), the Court will not grant summary judgment on this basis because it is unclear whether the FBI withheld any information based on this exemption.</u>

5 U.S.C. § 552a(j)(2) states that the head of an agency may promulgate rules to "exempt any system of records within the agency" (with certain exceptions) if the system of records "maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals." The FBI has exercised that authority to exempt its Central Records System from the individual access provisions of the Privacy Act, subject to its right

to waive the exemption where compliance does not "appear to interfere with or adversely affect the overall law enforcement process." *See* 28 C.F.R. § 16.96(a)(1).

"Records contained in CRS are exempt if they constitute law enforcement records within the meaning of the statute. Accordingly, the FBI bears the burden of demonstrating a law enforcement purpose for each record as to which it has claimed exemption in the case." *Majid v. Fed. Bureau of Investigation*, 245 F. Supp. 3d 63, 70 (D.D.C. 2017) (citing *Doe v. Fed. Bureau of Investigation*, 936 F.2d 1346, 1353 (D.C. Cir. 1991)). Records by a law enforcement agency must meet two criteria to qualify as law enforcement records: (1) the agency's investigatory activities giving rise to the documents must relate to the enforcement of federal laws or to the maintenance of national security; and (2) the nexus between the investigation and one of the agency's law enforcement duties must be based on "information sufficient to support at least a colorable claim of its rationality." *Id.* (citing *Doe*, 936 F.2d at 1353–54). "[A] reviewing court should be hesitant to second-guess a law enforcement agency's decision to investigate if there is a plausible basis for its decision." *Doe*, 936 F.2d at 1354–55. Once an agency meets both prongs of this test, the burden shifts to the plaintiff to produce evidence that "the asserted law enforcement rationale for an investigation was in fact pretextual." *Majid*, 245 F. Supp. 3d at 70 (citing *Doe*, 936 F.2d at 1354). "If the plaintiff fails to rebut the showing of law enforcement purpose, the agency is entitled to summary judgment." *Doe*, 936 F.2d at 1355.

Mr. Seidel's declaration indicates that the investigatory records at issue were

identified through searches of the CRS and that these records were "compiled during the FBI's fulfillment of its law enforcement duties." (Doc. 63-1 at 13). Specifically, RIDS identified two documents: (1) an FBI Complaint form ("FD-71") dated January 25, 2016, documenting submission of a complaint by Mr. Carpezzi alleging criminal activity; and (2) a letter from FBI personnel to state law enforcement in response to a request for information as part of an investigation. (Doc. 63-1 at 13–14). Mr. Seidel explains that the FBI creates an FD-71 during the submission of a complaint of reported criminal activity, and therefore, the FD-71 was compiled to capture Mr. Carpezzi's allegation of illegal activity and thus compiled for law enforcement purposes. (Doc. 63-1 at 13). As to the letter in response to the request for information, Mr. Seidel explains that the FBI responds to official requests for information from law enforcement agencies "as part of its duty to assist law enforcement." (Doc. 63-1 at 14). The Court finds that the FBI's investigatory activities giving rise to both the FD-71 and the letter to state law enforcement are related to the enforcement of federal laws and that the nexus between the FBI's investigation and its law enforcement duties is based on information sufficient to support at least a colorable claim of their rationality—the investigation related to the FD-71 was based on Mr. Carpezzi's own complaint, and the letter to state law enforcement was assisting state authorities in an ongoing investigation. Accordingly, the DOJ meets its burden of demonstrating that these documents fell under 5 U.S.C. § 552a(j)(2). *See Majid*, 245 F. Supp. 3d at 70 (explaining that "[r]ecords contained in CRS are exempt if they constitute law

enforcement records within the meaning of the statute.").

Conversely, Mr. Carpezzi did not meet his burden of demonstrating that the asserted law enforcement rationale for an investigation was pretextual. Indeed, Mr. Carpezzi's only argument on this point is that the "FBI had no right to consider any claim under the Privacy Act" and that the DOJ "has had over 17 years to manufacture evidence and file their own lawsuit against Plaintiff since placing him on a target list in the early 2000's." (Doc. 65 at 5).

Notwithstanding this Court's finding that the documents could have been withheld in their entirety under the Privacy Act, Mr. Seidel confirmed that the FBI still "reviewed the records under the access provisions of the FOIA to achieve maximum disclosure." (Doc. 63-1 at 13–14). Both the FD-71 and the letter to state law enforcement, with redactions, are appended to Mr. Seidel's declaration, as redacted. Accordingly, because the FBI does not appear to have withheld any information based on this exemption, the Court will not grant summary judgment on this basis alone.

III.  The FBI properly redacted names of law enforcement in the records pursuant to FOIA Exemption 7(C).

5 U.S.C. § 552(b) contains various exemptions to FOIA. Two of these exemptions are for "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6) (referred to as "Exemption 6"), and "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to

15

constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C) (referred to as "Exemption 7(C)").  "Exemption 6 has been held to cover all information applying to a particular individual."  *Stahlman v. U.S. Dep't of Just.*, No. 6:20-cv-733-WWB-EJK, 2021 WL 3176968, at *5 (M.D. Fla. May 21, 2021) (citations and quotation marks omitted).  "Exemption 7(C) protects a broader range of records."  *Id.* (citations and quotation marks omitted).  "Both Exemption 6 and Exemption 7(C) require a balancing of the privacy interests of the individuals in not having the records disclosed against the asserted public interest in disclosure."  *Id.* (citations and quotation marks omitted).  Importantly, "[w]here a court finds that a withholding of documents meets the standard of Exception 7(C), it need not address the more stringent 'clearly unwarranted' standard of Exemption 6."  *Id.* (citations and quotation marks omitted).  Accordingly, because the Court finds that the FBI's redactions are properly exempted pursuant to Exemption 7(C), the Court shall not address the Exemption 6 standard.

Mr. Seidel provides the following summary of information that the FBI withheld pursuant to Exemptions 6 and 7(C):

| SUMMARY OF EXEMPTION JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Exemptions 6 & 7(C)** | **Unwarranted/Clearly Unwarranted Invasion of Personal Privacy** |
| (b)(6)-1 and (b)(7)(C)-1 | Names of FBI Special Agents and Name of a Chief Division Counsel |
| (b)(6)-2 and (b)(7)(C)-2 | Name of a State Law Enforcement Employee |

(Doc. 63-1 at 15).

     *i.*    *The records at issue were compiled for law enforcement purposes.*

Exemption 7(C) requires the agency to show that the records at issue were

compiled for law enforcement purposes.  *See* 5 U.S.C. § 552(b)(7)(C).  As described in Section I above, this Court has already found that both the FD-71 and the letter between law enforcement, in response to a state law enforcement agency's request for information were compiled for a law enforcement purpose.  Mr. Carpezzi, however, cites two cases in support of his argument that the documents were not compiled for law enforcement purposes.  Each of these cases is readily distinguishable.

First, in *Rural Housing Alliance v. United States Department of Agriculture*, 398 F.2d 73, 80–81 (D.C. Cir. 1974), the Court analyzed the application of Exemption 7 to an internal investigation by the USDA to determine whether certain staff had engaged in racial discrimination and then found that "investigatory files compiled for law enforcement purposes" must be given the same meaning, whether the subject of the files is a government employee or an ordinary private citizen.  But the subject of the two files here are not internal audits by FBI staff, making that case inapposite.  Second, in *American Civil Liberties Union of Northern California v. Federal Bureau of Investigation*, No. C 12-03728 SI, 2014 WL 4629110, at *6 (N.D. Cal. Sept. 16, 2014), the Court found that although a legitimate law enforcement purpose was established, the FBI failed to establish a nexus between the documents at issue and that purpose.  There, the only factual information that the FBI provided was that the investigation involved "potential criminal activity by protestors involved with the Occupy movement."  *Am. Civ. Liberties Union of N. Cal.*, 2014 WL 4629110, at *6 (citations and quotation marks

omitted).  But, here, Mr. Seidel provides much more detail than just "potential criminal activity"—he states that the complaint form "was compiled to document an allegation of criminal activity filed by the Plaintiff" and that the letter to the state law enforcement agency was "in response to a state law enforcement agency's request for information as part of an investigation."  (Doc. 63-1 at 16).

The Court finds that the DOJ has successfully established that the two records at issue were compiled for law enforcement purposes, such that they meet the threshold for Exemption 7(C).

  *ii. The records were properly redacted pursuant to Exemption 7(C).*

Mr. Seidel explains that assignments of Special Agents to particular investigations are not by choice, that publicity arising from a particular investigation "may seriously prejudice their effectiveness in conducting investigations and in performing day-to-day work," that the publicity associated with the release of a Special Agent's identity in connection with a particular investigation "could trigger hostility" towards the Special Agent, and that people targeted in investigations "could seek to inflict violence on [a Special Agent] based on his or her participation in the investigation."  (Doc. 63-1 at 19).  On the other hand, as Mr. Seidel points out, disclosure of the Special Agents' identities would serve no public interest because "their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities."  (*Id.*).  The Court agrees.

With respect to the name of a Chief Division Counsel, Mr. Seidel explains

that, similar to FBI Special Agents, the Chief Division Counsel "could be targeted for reprisal based on his/her involvement in a specific investigation." (*Id.* at 20). Moreover, this CDC "was and possibly still is, in a position of access to information regarding official law enforcement investigations, and therefore could become a target of inquiries for unauthorized access to investigations if his/her identity were released." (*Id.*). Mr. Seidel avers that similarly to the release of Special Agents' names, no public interest would be served by disclosing the identity of this Chief Division Counsel to the public, because their identity would not increase the public's understanding of the FBI's operations and activities. (*Id.*). The Court, again, agrees.

Finally, with respect to the name of a State Law Enforcement Employee, Mr. Seidel explains that the employee was "acting in their official capacity and aided the FBI in the law enforcement investigative activities reflected in the records responsive to Plaintiff's request," and that the rationale for protecting their identity is similar to the rationale for protecting the identities of Special Agents and Chief Division Counsel. (*Id.*). Thus, the Court finds that the interest in protecting the State Law Enforcement Employee outweighs any public interest that might be served by release of the identity because releasing the identity would not increase the public's understanding of the FBI's operations and activities. (*Id.* at 20–21).

Balancing the private interest involved against the public interest (ensuring an informed citizenry, checking against corruption, and holding the government accountable, *see Hawkins*, 2005 WL 2063811, at *1), the Court finds that the

privacy interests of the identities of the FBI Special Agents, the Chief Division Counsel, and the name of the State Law Enforcement Employee outweigh any purported public interest that would be served by releasing their names. Accordingly, requiring the FBI to release such names would constitute an unwarranted invasion of personal privacy under Exemption 7(C).  *See Local 32B-32J, Serv. Emps. Intern. Union, AFL-CIO v. Gen. Servs. Admin.*, No. 97 Civ. 8509 (LMM), 1998 WL 726000, at *9 (S.D.N.Y. Oct. 15, 1998) ("Courts have consistently recognized the privacy interests of persons—both witnesses and investigate agents—identified in agency documents. . . . [D]isclosure of the names of the law enforcement personnel involved in an investigation could . . . lead to harassment and could interfere with the performance of their duties.") (citations omitted).

IV.  <u>The FBI properly redacted an FBI sensitive investigation file number and an FBI database identifier under Exemption 7(E).</u>

Under 5 U.S.C. § 552(b)(7)(E), FOIA does not apply to "records or information compiled for law enforcement purposes" to the extent that production of such information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  The phrase "if such disclosure could reasonably be expected to risk circumvention of the law" has been interpreted broadly.  *Broward Bulldog, Inc. v. U.S. Dep't of Justice*, No. 12-61735-CIV-ZLOCH, 2019 WL 13178390, at *30 (S.D. Fla. Aug. 22, 2019).  "Exemption 7(E) protects information that would reveal facts about techniques or their usefulness that are not generally

known to the public, as well as other information when disclosure could reduce effectiveness of such techniques." *Broward Bulldog*, 939 F.3d at 1192. "An agency must demonstrate only that release of a document might increase the risk that a law will be violated or that past violators will escape legal consequences." *Jeanty v. F.B.I.*, No. 13-20776-CIV, 2014 WL 4206700, at *7 (S.D. Fla. Aug. 25, 2014) (citing *Pub. Emps. For Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 2016 (D.C. Cir. 2014)) (quotation marks omitted).

The FBI cited Exemption 7(E) in supports of its redaction of two types of information from the FD-71 complaint: FBI sensitive investigation file numbers and FBI database identifiers. (Doc. 63-1 at 21–24).

With respect to the file number, Mr. Seidel explains that FBI file numbers contain three components: (1) the CRS file classification number; (2) the abbreviation of the FBI office of origin ("OO") initiating the file; and (3) the assigned individual case file number for that particular subject matter. (Doc. 63-1 at 7). Mr. Seidel further explains that "[m]any of the FBI's classification numbers are known to the public, which makes disclosure of the non-public classification numbers even more telling." (Doc. 63-1 at 21–22). Additionally, according to Mr. Seidel, "releasing non-public FBI file classification numbers would reveal critical information about non-public investigative techniques and procedures, and provide criminals and foreign adversaries with the ability to discern the types of highly sensitive investigative strategies the FBI pursues whenever such file classification numbers are present." (Doc. 63-1 at 22). The second component, the two-letter office of origin

21

code also "provide[s] critical information about where and how the FBI detected

particular criminal behavior or national security threats, and reveal key pieces

about the FBI's non-public investigations or intelligence or evidence gathering

sources and methods." (*Id.*). Moreover, "[r]evealing this information could also

provide significant information about the FBI's failure to detect certain types of

criminal behavior." (*Id.*). Finally, with respect to the assigned string of numbers

for the particular subject matter under investigation, Mr. Seidel explains that

"[r]eleasing these singular file numbers would provide criminals and foreign

adversaries with a tracking mechanism by which they can place particular files, and

thus, investigations, within the context of larger FBI investigate efforts" and,

finally, that releasing all three components "would provide criminal and foreign

adversaries with an idea of how FBI investigations may be interrelated and,

potentially, when, why, and how the FBI pursues or pursued different

investigations." (*Id.* at 22–23).

Mr. Carpezzi's primary argument against summary judgment with respect to

the Exemption 7(E) redactions is that the FBI or the DOJ "purchased American

Online Source Codes allowing full access to spy on American emails before Edward

Snowden released information on the Prism program" and that the government

does not have "cart blanche to withhold 'already disclosed law enforcement

techniques' on the basis of their relation to an investigation." (Doc. 65 at 9–10).

The Court does not see a connection between any AOL investigation and the

redacted file numbers. The Court finds that the DOJ has made an adequate

showing to support the redaction of this information. *See Broward Bulldog, Inc.*, 2019 WL 13178390, at *31 (finding that defendants made an adequate showing where their reasoning for redacting file numbers included that file numbering "identifies interests or priority" and provides information which could allow suspects to "avoid detection, apprehension, or create alibis for suspected activities").

With respect to the database identifier, Mr. Seidel indicates that revealing the identity of this database (1) "would give criminal insight into the available tools and resources the FBI uses to conduct criminal and national security investigation," (2) "would reveal the nature of its utility to FBI investigators," and (3) "could jeopardize the FBI's investigative function by revealing exactly where the FBI stores and from where it obtains valuable investigative data." (Doc. 63-1 at 23–24). For similar reasons as with the file numbers, the Court finds that the DOJ has made an adequate showing to support the redaction of this information. *See Kowal v. U.S. Dep't of Just.*, No. CV 18-2798 (TJK), 2021 WL 4476746, at *6 (D.D.C. Sept. 30, 2021) (finding that database identifiers were properly withheld because "[t]his kind of technical information is regularly withheld under Exemption 7(E), and the FBI has sufficiently explained the logic that justifies withholding it here"). Consequently, the sensitive investigation file number and the database identifier were properly redacted from the disclosed documents and withheld from disclosure.

*-Remainder of page intentionally left blank-*

## CONCLUSION

For the foregoing reasons, the DOJ's Motion for Summary Judgment (Doc. 63) is **GRANTED**.  The Clerk of Court shall enter judgment accordingly, terminate all other pending motions and deadlines and close the case.

**ORDERED** at Fort Myers, Florida on March 27, 2023.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE